**Donald F. FESPERMAN, Jr.,**
Respondent,

v.

**SILVER DOLLAR CITY,**
**INC., Appellant.**

No. 16335.

Missouri Court of Appeals,
Southern District,
Division Two.

Aug. 16, 1990.

Rehearing Denied Sept. 10, 1990.

Donald W. Ingrum, Branson, for appellant.

Scott B. Tinsley, P.C., Springfield, for respondent.

WASSERSTROM, Senior Judge.

Plaintiff sues to collect the unpaid amount on a contract to supply trees. Defendant counterclaims for deficient performance by plaintiff. After trial without a jury, the trial court awarded damages to plaintiff on his petition and to defendant on its counterclaim. Defendant appeals from that portion of the judgment adverse to it. There being no appeal from the judgment on the counterclaim, only those facts pertaining to plaintiff's claim will be stated.

On October 27, 1978, defendant issued its purchase order to plaintiff for a large number of trees including fifty-one sycamores, to be supplied for a new development referred to in the evidence as the Whitewater project. The purchase price was $55,130, of which defendant made an advance payment of $13,750. The order called for delivery in March 1979. However, by March 1979, the Whitewater project was not ready and the parties mutually agreed that the trees should be delivered to defendant's Silver Dollar City theme park.[1]

Due to wet weather in Iowa, where plaintiff was to obtain most of the trees, delivery to plaintiff was delayed and the first trees did not arrive in Springfield until the first week of April, with further deliveries continuing through mid-May. The best time for planting trees of this kind was between November and the end of March or, at the latest, by mid-May. Nevertheless, plaintiff continued to supply trees for planting and defendant accepted those trees into June 1979.

Special difficulties existed with respect to the delivery of these trees because the

---

1. The record contradicts defendant's statement in its brief to the effect that the parties originally agreed for the trees to be delivered to Silver Dollar City, that there was thereafter an oral agreement changing the place of delivery to Whitewater, and still a second change for delivery to be made to Silver Dollar City instead of Whitewater. Some initial plausibility is lent to these statements by the fact that the purchase order is checked in a box showing place of delivery to be Silver Dollar City in Branson.

However, the block at the top of the order referring to place of delivery contains only two boxes for checking. One was "Silver Dollar City, Highway 76, Branson, Missouri" and the other box was "Silver Dollar City, Pigeon Forge, Tennessee." There was no box labeled "Whitewater Project." Quite obviously, the box for Branson was checked only because it was more appropriate than the one for Pigeon Forge, Tennessee.

The matter is clear beyond doubt by reason of the pleadings and evidence. Paragraph 3 of the petition alleges that the original agreement on October 27, 1978, called for the trees in question to be planted at the Whitewater project, and plaintiff testified without objection and without contradiction to that effect. Defendant's answer admitted the allegations of paragraph 3 of the petition, and defendant's counterclaim affirmatively adopted the allegations of that paragraph.

Silver Dollar City theme park was open to the public five days a week from the latter part of April to the end of May, leaving only two days within which to plant trees. After Memorial Day, the theme park was open to the public seven days a week and the time available for planting was still further restricted. Additionally, the topography of Silver Dollar City was such as to require much truck maneuvering to get the trees to the planting area, rendering it impossible to deliver more than four to five trees a day. By contrast, if the trees had been delivered at Whitewater, according to the original understanding, all the trees could have been planted in one week.

By Summer 1979, plaintiff still had thirty-three sycamore trees on hand, and it had become too late for planting. Plaintiff testified that the parties agreed that plaintiff should store the thirty-three trees at his Maplewood Gardens in Springfield until the Fall season and that plaintiff would be compensated for the care and storage of the trees until that time. Testimony was offered by defendant to the effect that it knew that the trees were being stored at Maplewood Gardens but believed them to be trees which had been previously delivered by plaintiff to Silver Dollar City and rejected by defendant.

In August 1979, the parties held a meeting at Maplewood Gardens. Defendant's witness Graves testified that defendant's purpose for the meeting was to get plaintiff to replace six trees which had been planted but which had died, and also to obtain a refund by plaintiff of the portion of defendant's $13,750 advance payment which represented trees which plaintiff had not delivered. Plaintiff testified that the purpose of the meeting was a proposal by defendant to rescind the old contract and supplant it with a new arrangement under which plaintiff would supply trees under an enlarged $85,000 landscaping budget for the Whitewater project. This new project would have included a number of sycamore trees.

During the course of the meeting, plaintiff stated to defendant's representative that he would agree to the proposition provided he was given the exclusive right to furnish all the landscaping and further provided that defendant would furnish him with a $10,000 advance payment. Graves, one of the conferees on behalf of defendant, responded that he would talk to his supervisor about those conditions and then communicate with plaintiff further.

Immediately after that meeting, plaintiff began making inquiries of his suppliers as to availability of trees for the contemplated new project. However, by October he had heard nothing more from defendant. He then began making phone calls, followed by letter to Graves on October 3, 1979, and then a telegram to Graves dated October 24, 1979. Then plaintiff learned that competitors of his were putting in landscaping at the Whitewater project.

Finally, plaintiff was able to reach defendant's representative Kreps and asked what was going on. Kreps answered that defendant was too big to do business with only one supplier. Plaintiff then asked what he was supposed to do with the thirty-three sycamores which he held in storage, to which Kreps answered that he did not know.

With that, plaintiff concluded that his contract with defendant was at an end, and he tried to find buyers for the thirty-three sycamore trees. He was unable to do so, and the trees, while in storage, died during the 1980 drought. Ultimately, they were cut up and burned.

Defendant's points on appeal, briefly summarized, are as follows: (1) that plaintiff is not entitled to recover because he did not tender delivery of the thirty-three trees; and (2) plaintiff's failure to deliver the trees was the result of wet weather in Iowa, which was a risk assumed by him.

I

*Tender of Performance by Plaintiff*

Defendant relies on § 400.2–507 [2] and § 400.2–301, which makes a seller's right to recover under a sales contract contingent

---

**2.** All statutory references in this opinion are to RSMo 1986.

upon delivery or tender of delivery. Plaintiff, on the other hand, relies on § 400.2–610(c) which excuses tender by the seller when the buyer repudiates the contract, thereby committing an anticipatory breach.

■ Here, defendant did clearly repudiate the contract. Under its evidence, it called the August meeting for the purpose of obtaining replacement of six trees which had died and "to discuss some credit arrangement that was due Silver Dollar City on the initial payment by them." This demand by defendant for a refund on its advance deposit necessarily meant that it considered the 1979 contract at an end.

Moreover, its actions following the August meeting confirmed its repudiation of the contract. Despite Graves' promise to further communicate with plaintiff, plaintiff testified and the trial court found that there was no further communication from Graves. The plaintiff tried by phone calls, a letter and a telegram to re-establish contact, without success. Finally, plaintiff did succeed in talking to Kreps, and when plaintiff asked what he should do with the thirty-three trees in storage, Kreps answered that he didn't know.

All of this made perfectly plain to plaintiff that defendant no longer intended to recognize the 1979 contract or otherwise deal with him with respect to the thirty-three trees. Under those circumstances, a tender was futile and unnecessary. Indeed, it would be preposterous to require plaintiff to haul out to Silver Dollar City these very large trees, twenty-eight to forty-two feet in height, when defendant had made it clear that those trees would not be accepted.

Still further, defendant did not defend in the trial court on any theory of lack of tender. Instead, it defended on the wholly different and inconsistent theory that it had repudiated the contract because of un-acceptable performance by plaintiff. Thus, paragraph 12 of defendant's counterclaim states: "In August 1979, agents and employees of Defendant advised Plaintiff they considered the original purchase order and contract to be terminated for failure of Plaintiff to deliver trees that were of acceptable size and quality and for failure of Plaintiff to replace the trees which had died or make an adjustment to Defendant's account with Plaintiff therefor." Defendant attempted to support that theory of defense by testimony from Graves who testified that there was a large load of approximately thirty trees which had been delivered to Silver Dollar City and rejected by him. This testimony by Graves was disputed by other witnesses, and the trial court expressly rejected Graves' testimony in that respect.

■ The present attempt by defendant to defend on a theory of lack of tender was not submitted to the trial court and in fact contradicts its own trial theory. Such a shift of position cannot be permitted. A defense not presented to nor passed upon by the trial court cannot be presented on appeal. See cases collected in West's Missouri Digest 2d, Appeal and Error, § 173(1).

■ Defendant objects to any consideration of the doctrine of anticipatory breach, because the trial court made no finding of repudiation by defendant and did not rely thereon as a basis for decision, but rather the trial court found and relied for its decision on a finding that defendant did not reject the trees at the time of the August conference. Whether or not the trial court's decision can be supported on defendant's failure to reject the trees at the August conference is of little importance.[3] A correct decision by a trial court will not be disturbed by the appellate court merely because the trial court gave a wrong or

**3.** However, a substantial argument can be made that this finding does support the trial court's decision. It will be remembered that defendant defended on the theory that it had previously rejected the trees. The trial court refused to believe that evidence. Its finding concerning defendant's failure to reject at the August con-ference apparently was a further response to defendant's said defense. Further, the trial court may have considered the storage of the trees by mutual agreement as a constructive delivery calling for acceptance or rejection by defendant within a reasonable time. See § 400.2–601 and § 400.2–602.

insufficient reason therefor. *Edgar v. Fitzpatrick*, 377 S.W.2d 314 (Mo. banc 1964); *Williamson v. Home Insurance Co.*, 778 S.W.2d 281, 282 (Mo.App.1989); *Robinson v. Powers*, 777 S.W.2d 675, 678 (Mo.App.1989); *Dobyns v. Dobyns*, 650 S.W.2d 701 (Mo.App.1983).

The record in this case, especially defendant's own pleading, abundantly shows that defendant did repudiate the contract, thereby excusing tender under § 400.2–610(c) and § 400.2–703.

## II.

### *Reason for and Effect of the Delay in Performance by Plaintiff*

Defendant argues that the reason for plaintiff's delay in delivering the trees was wet weather in Iowa; that such a possibility was a contingency assumed by plaintiff under the contract; and that this factor therefore did not excuse plaintiff's performance under the provisions of § 400.2–615. Unquestionably the wet weather in Iowa was one factor for plaintiff's delay. On the other hand, the change in place of performance from Whitewater to Silver Dollar City was an even more important factor and was so found by the trial court.

In any event, which of those factors was the effective or more important reason for the delay does not matter, because the delay did not put plaintiff in default. Under the facts, the parties mutually agreed to an extension of time for performance. Defendant's Exhibit 4 shows that defendant accepted trees at Silver Dollar City from plaintiff as late as June 21, 1979. Furthermore, under plaintiff's evidence the parties thereafter further agreed to storage of thirty-three trees remaining undelivered until they could be more appropriately planted the following November. The trial court believed the latter testimony finding that: "both parties continued to operate under the contract until October, 1979."

Accordingly, the finding by the trial court with respect to the cause for the delay can be treated as surplusage, and any argument with respect to the causation for delay becomes wholly immaterial.

The judgment is affirmed.

FLANIGAN, P.J., and SHRUM, J., concur.